UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
UNITED STATES OF AMERICA

                                                                11 Cr 372 (RPP)

        - against –

                                                             **OPINION AND ORDER**

GERALD ROLAND,

                           Defendant.
-------------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

      By motion dated October 24, 2011, Defendant Gerald Roland ("Roland" or "Defendant") moved to suppress evidence seized as fruits of an unlawful arrest by the New York City Police Department ("NYPD") on or about June 1, 2010. On October 26, 2011 and November 4, 2011, the Court conducted an evidentiary hearing on the matter. On November 14, 2011, Defendant submitted a post-hearing memorandum in support of his motion to suppress. On November 22, 2011, the Government responded in opposition to the motion. On November 28, 2011, Defendant submitted his reply memorandum. For the following reasons, Defendant's motion to suppress is denied.

**I.    Factual Background**

      Defendant was observed by the Street Narcotics Enforcement Unit ("SNEU")[1] of the 28th Precinct conducting a hand to hand drug transaction on the night of June 1, 2010. (Transcript of October 26, 2011 Hearing ("Oct. Tr.") at 3-5, 11.) The unmarked observation vehicle of the

---

[1] SNEU units conduct "observations of violations of the New York State penal drug laws and apprehend individuals breaking the law." (Transcript of November 4, 2011 Hearing, at 4.)

SNEU unit was manned by Police Officer Neil Lawson ("Officer Lawson") and was parked on the south side of W. 114th Street between 7th and 8th Avenues. (Id. at 6, 9-10.) West 114th Street between 7th and 8th Avenues consists of row houses operated by the New York City Housing Authority on the north and south side of the block, with Wadleigh High School occupying the northeast corner of the block bordering W. 114th Street for 300 or 400 feet. (Defense Exhibit ("Ex.") 14; Oct. Tr. at 7, 9, 28.) Officer Lawson testified that he observed Defendant standing on a stoop of an address he believed to be 257 W. 114th Street.[2] (Id. at 10, 12-13.) Officer Lawson stated that he had seen Defendant before, but was unaware of his name or identity. (Id. at 35.) Officer Lawson testified that 257 W. 114th Street was located "to my left and I believe one building behind me" on the north side of the street. (Oct. Tr. at 13.) Officer Lawson estimated that he was approximately 40 feet from the Defendant's location. (Id. at 24.) Although it was after dusk, Officer Lawson could see clearly without using any visual aids because the street lighting made it "clear enough for me to see." (Id. at 22-23, 25-26.)

Within 15-20 minutes of parking his vehicle, Officer Lawson observed an individual approach Defendant with U.S. currency in his hand. (Id. at 10.) Defendant walked down from the stoop and met this individual on the sidewalk in front of the stoop at 257 W. 114th Street. (Id.) Officer Lawson testified that after engaging in brief conversation, Defendant accepted U.S. currency from the individual and in exchange, handed the individual "small objects from what appeared to be a small plastic bag." (Id.) Officer Lawson witnessed this same series of events take place three separate times, with three different individuals. Based on his training and

---

[2] Officer Lawson testified that he believed Defendant was located between the third and fourth buildings up from Wadleigh High School headed west on the north side of W. 114th Street.

experience,[3] Officer Lawson believed that Defendant was exchanging narcotics for cash in the observed transactions. (Id. at 11, 33.) Officer Lawson testified that "that particular block is known by the precinct – it's targeted as a narcotics-prone location." (Id. at 11.) Officer Lawson also testified that the individuals approaching the stoop at 257 W. 114th Street displayed their money in a way that indicated to him that "their intention is to see if people are out there selling narcotics." (Id.) Officer Lawson stated that every exchange happened in exactly the same manner with Defendant giving the individuals small objects from a bag concealed on Defendant's person and the individuals giving Defendant money. (Id.) Officer Lawson testified that he did not make the call to arrest the Defendant after the first alleged sale because "normally I let one or two of these transactions occur, only because I need to satisfy myself that in fact what I'm observing is what I think it is – a narcotics transaction." (Id. at 11-12.)

The third and final transaction that Officer Lawson observed involved a buyer later identified as Eric Ward ("Ward"). (Id. at 12.) Officer Lawson first noticed Ward walking west on the north side of W. 114th Street towards Defendant's location. (Id. at 36-37.) Officer Lawson observed the Defendant and Ward conduct an exchange similar to the previous transactions he witnessed. (Id. at 11-12, 38-39.) Officer Lawson stated that he observed Ward open his hand and examine the object that Defendant had given him. (Id. at 12, 39.) Officer Lawson testified that this examination of the object is commonly an indication as "people that purchase crack . . . normally look at it right after they get it." (Id. at 12.) Ward left 257 W. 114th Street and proceeded eastbound on the north side of W. 114th Street towards 7th Avenue. (Id.) While he continued to observe Ward, Officer Lawson noticed that Ward deliberately passed

---

[3] Officer Lawson testified that he had participated in "hundreds" of narcotics arrests. (Oct. Tr. at 4.)

through a fire hydrant on the north side of the block which was spraying water into the air. (Id. at 12, 39-41.) After passing through this spray of water, Ward continued east on W. 114th Street and made a left onto 7th Avenue, heading north. (Id. at 12, 41.)

The SNEU unit apprehension team[4] was located around the block from Officer Lawson on Seventh Avenue between W. 115th Street and W. 116th Street facing south. (Id. at 74.) Police Officer Angelica Salmeron ("Officer Salmeron") and Police Officer Scott Roberts ("Officer Roberts") of the apprehension team testified that they observed Ward walk on the south side of the block and make a right onto 7th Avenue and head south. (Id. at 12.)

### *The Arrest of Eric Ward*

Officer Lawson testified that he radioed a description of Ward to the apprehension team while Ward was walking eastbound on W. 114th Street. (Id. at 13.) Officer Lawson testified that he described Ward as a tall, light-skinned, African-American male wearing a three-quarter length jacket and a black hat. (Id. at 36.) Officer Lawson did not remember the color of the jacket other than believing it to be "a light color – but it was dirty." (Id. at 37.) On cross-examination, Officer Salmeron testified that Officer Lawson's radio transmission described Ward as "a male black, wearing all black, that he was actually wet because he had gone through a fire hydrant that was open." (Id. at 73.) Officer Lawson testified that Officer Roberts replied to his transmission by stating over the radio, "what the hell are you doing? This guy pissed himself. Why did you radio this? Why did you send this guy to us?" (Id. at 13.) Officer Lawson relayed to Officer Roberts that Ward was wet because he had passed through the open fire hydrant on W. 114th

---

[4] The apprehension team or "chase car" is tasked with effecting the arrest of a suspect once a suspected narcotics exchange has taken place. (Oct. Tr. at 60.) Officer Salmeron testified that the apprehension team was made up of herself, Officer Scott Roberts, Officer Keisha Frazier, and Sergeant Irving Contreras. (Oct. Tr. at 60.) Sergeant Contreras had no recollection of the arrest of the Defendant. (Id. at 12-13, 14.) Officer Frazier did not testify at the hearing.

4

Street. (Id. at 13-14.) Officer Salmeron believed that Ward was wearing black jeans, a black sweater, and a black jacket. (Id. at 81-82.)

Officer Salmeron and Officer Roberts testified that as they exited the apprehension vehicle on the southwest corner of W. 114th street to stop the individual matching Officer Lawson's description, they observed the individual "drop a piece of tinfoil to the ground." (Id. at 62, 116.) Officer Salmeron retrieved the tinfoil and found what appeared to be crack cocaine inside. (Id. at 62, 64.) Officer Salmeron made this determination based on her training and experience with narcotics. (Id. at 64.) Officer Salmeron instructed Officer Roberts to handcuff Ward after determining the substance contained in the tinfoil was narcotics. (Id.) Officer Salmeron testified that this arrest occurred at approximately 9:40 p.m. (Id. at 63.) Officer Salmeron and Officer Roberts radioed Officer Lawson that the individual apprehended was "positive," meaning positive for possessing narcotics. (Id. at 14, 79-80, 113.) Officer Roberts testified that the apprehension team placed Ward into the prisoner van which had arrived at the location.[5] (Id. at 127.)

Officer Lawson did not observe the arrest of Ward, however, he testified that the arrest took place on 7th Avenue just north of W. 114th Street. (Id. at 42.) Officer Lawson testified that approximately five minutes had elapsed from the time he observed the sale until he learned of Ward's arrest. (Id.) Officer Lawson continued to observe the Defendant during this five minute time period. (Id. at 14, 15, 43.)

In his videotaped statement at the New York County District Attorney's Office, Ward denied buying or possessing crack cocaine. (See Videotaped Interview of Eric Ward, Defense

---

[5] Officer Salmeron testified that she remembered Ward being placed in the back of a car. (Oct. Tr. at 82.)

Ex. 19.) Ward also denied knowing the Defendant. (Id.) Ward accused Officer Salmeron of falsely arresting him and describes rough treatment by the officers. (Id.) Additionally, Defendant notes that in Ward's videotaped statement, Ward is not wearing a hat. (Id.) On September 7, 2011, however, Ward pleaded guilty to Criminal Possession of a Controlled Substance in violation of N.Y Criminal Penal Law § 220.20. (Defense Ex. 16.)

*The Arrest of Defendant*

Officer Lawson testified that during the arrest of Ward he was "repeating descriptions of the defendant in this case and his location and what he was doing" to the arresting officers. (Id. at 14.) Officer Lawson described Defendant as a medium build, African-American male with facial hair. (Id. at 35.) Officer Lawson stated that after the exchange with Ward, Defendant walked back onto the stoop and then returned to the sidewalk and "appeared [to Officer Lawson] as if he was about to leave the location." (Id. at 14, 15.) Upon observing this, Officer Lawson radioed the apprehension team to move in and arrest the Defendant. (Id. at 14.) Officer Lawson repeated the description of the Defendant to the apprehension vehicle. (Id. at 15.) A couple seconds after the arrest of Ward, Officer Salmeron testified that the apprehension team received another transmission from Officer Lawson providing a description of Defendant. (Id. at 64.) This transmission described the individual who sold the drugs to Ward as a "male black . . . standing in front of [building number] 204." (Id.) According to Officer Salmeron, Officer Lawson's transmission also stated that it looked like "he [the seller] was getting ready to move." (Id.) Officer Roberts testified that after hearing Officer Lawson's description of Defendant, he walked westbound on W. 114th Street and observed a man matching the description given by Officer Lawson standing in front of one of the first buildings on the north side of the block just

6

west of Wadleigh High School.[6] (Id. at 117-118.) Officer Roberts instructed Defendant to "put your hands behind your back." (Id. at 118.) Officer Roberts testified that Defendant asked, "what am I being arrested for?" (Id. at 119.)

Officer Salmeron arrived at the arrest location in the apprehension vehicle after circling the block just as Officer Roberts was placing Defendant in handcuffs. (Id. at 65.) Officer Salmeron testified that Officer Lawson stated over the radio "that's the guy," as she approached the Defendant in the apprehension vehicle. (Id. at 66.) Officer Lawson received a radio transmission from Officer Salmeron stating that "I got him, I see him," at which point Officer Salmeron exited the apprehension vehicle and walked towards Defendant. (Id. at 15.) Officer Lawson then radioed to Officer Salmeron, "yes, that's him." (Id.) Officer Lawson testified that approximately ten minutes had elapsed between the sale to Ward and the arrival of the apprehension team to Defendant's location. (Id.) Officer Salmeron wrote in her activity book that the arrest took place in front of 204 W. 114th Street, however, when asked by the Government to point to the location on the map, Officer Salmeron indicated that the arrest took place on the north side of the block slightly west of Wadleigh High School. (Id. at 65, 88.) Officer Salmeron testified that she believed the location she had pointed to was 204 W. 114th Street. (Id. at 65, 102.)

Once the apprehension team made contact with Defendant, Officer Lawson started the observation vehicle and drove off. (Id. at 15-16, 47.) Officer Roberts and Officer Salmeron could not remember seeing Officer Lawson exit the vehicle to identify the Defendant.[7] (Id. at

---

[6] Officer Lawson testified that all members of the apprehension team arrived at Defendants' location in the apprehension vehicle.
[7] The notes of Officer Robert's meeting with the U.S. Attorney's Office on Aug. 10, 2011, state that Officer Lawson did exit the vehicle and identify Defendant. (Defense Ex. 2(a).)

7

134, 94-95.) Officer Lawson testified that he did not participate in the physical arrest of Defendant but he could not remember if he returned to the scene to assist with the search for contraband. (Id. at 31, 48.) Later that evening at the 28th Precinct, Officer Lawson identified Defendant as the individual he observed engage in a hand to hand exchange with Ward. (Id. at 48.)

Officer Roberts testified that he conducted a search of the Defendant after placing him under arrest and recovered $209 dollars, a cell phone and two batteries. (Id. at 119-120.) No crack cocaine or any other narcotics were discovered on Defendant's person or within his immediate vicinity. (Id. at 137.) Officer Roberts stated that he walked the Defendant to a transport vehicle located on W. 114th Street. (Id. at 131.) While fingerprinting Defendant at the precinct, Officer Salmeron testified that Defendant asked her "what he was arrested for," to which Officer Salmeron replied, a "drug sale." (Id. at 89.) Defendant inquired whether the arrest was made as a result of an observation. (Id.) Defendant had not yet received his Miranda rights. (Id.)

Officer Salmeron testified that she prepared the arrest report of the Defendant a few hours after the arrest was made. (Id. at 67, 95.) Officer Salmeron indicated on the report that the arrest location was 204 W. 114th Street. (Id. at 105.) The arrest report lists Defendant's home address as 257 W. 114th Street. (Id. at 106.) Officer Salmeron testified that this address is located on the same block as the address listed as the location of Defendant's arrest. (Id.)

Sergeant Irving Contreras, the supervisor of the SNEU team on June 1, 2010, was called to testify by Defendant. Sergeant Contreras' activity book also listed the location of the arrest as

8

204 W. 114th Street. (Transcript of November 4, 2011 Hearing, at 9.) Sergeant Contreras testified that he had no recollection of the arrest of Defendant on June 1, 2010. (Id. at 12-13, 14.)

On November 5, 2010, Officer Lawson testified in the New York State grand jury that he observed Defendant selling narcotics in front of 204 W. 114th Street. (Defense Ex. 12, at 4-5.) Officers Salmeron and Roberts testified in the same grand jury that Defendant was arrested on the stoop of 204 W. 114th Street. (Defense Ex. 8, at 10; Defense Ex. 4, at 13-14.) At the hearing on October 26, 2011, Officer Lawson identified the Defendant as the individual who he observed engage in the alleged narcotics transaction. (Oct. Tr. at 4-5.)

## II.     Discussion

Defendant argues that he was illegally arrested because the Government cannot demonstrate that the arresting officers had probable cause to believe a crime had been committed or that Defendant was involved in such crime. Defendant's motion rests entirely on the inconsistencies found in the testimony and reports of the officers involved in Defendant's arrest on June 1, 2010. Defendant states that "the contradictory testimony about material facts at the heart of this case sets the cornerstone of the government's inability to demonstrate even to a preponderance standard what if anything actually occurred on W. 114th Street on June 1, 2010, or to persuasively show that Gerald Roland committed any crime whatsoever." (Defendant's Post-Hearing Mem. in Supp. of Mot. to Suppress ("Def. Mem.") at 8.) Specifically, Defendant points to the inconsistencies in the location of the alleged sale of narcotics and arrest of Defendant, and the physical description of Ward.

A.   Governing Law

The Fourth Amendment of the United States Constitution protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures."  An officer may not effectuate a warrantless arrest unless he or she has probable cause to believe that a crime has been committed or is in the process of being committed.  Devenpeck v. Alford, 543 U.S. 146, 152 (2004); United States v. Delossantos, 536 F.3d 155, 158 (2d Cir. 2008).  Probable cause exists when "officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Walczyk v. Rio, 496 F.3d 139, 156 (2d Cir. 2007) (quoting Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996)).  "Probable cause to search is demonstrated where the totality of circumstances indicates a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" Id. at 156 (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).  It is well settled that probable cause is not a rigid legalistic term, but rather deals with "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Maryland v. Pringle, 540 U.S. 366, 370 (2003) (quoting Gates, 462 U.S. at 231).

B.   The Police Had Probable Cause to Arrest Defendant

Officer Lawson testified that he observed the Defendant engage in three hand to hand exchanges with other individuals in an area known to be narcotics prone.  Officer Lawson concluded that these transaction were narcotics for cash exchanges based on making "hundreds" of narcotics arrests throughout his career. (Oct. Tr. at 4.)  First, Officer Lawson testified that the buyers approached Defendant waving their money in a way that was consistent with buyers of

narcotics. Secondly, Officer Lawson observed these individuals approach Defendant, have a brief a conversation, and then exchange U.S. currency for "small objects from what appeared to be a small plastic bag." (Id. at 10.) Once again, Officer Lawson testified that based on his training and experience, he believed these exchanges to be narcotics transactions. Officer Lawson hardened his belief that Defendant was conducting narcotics transactions by observing the same manner of exchange between Defendant and three different individuals. There is no requirement that an officer positively identify the object that is being exchanged to establish probable cause to make an arrest. See Pena v. State of New York, No. 04 Civ. 9499 (DAB), 2008 WL 4067339, at *9 (S.D.N.Y. Aug. 26, 2008) ("the fact that the officers could not describe the object that they saw petitioner hand to the suspected buyer does not preclude the officers' observations from supporting an inference that petitioner was handing narcotics to the suspected buyer as part of a sale."); Sam v. Brown, No. 00 Civ. 4170 (JG), 2002 WL 31102644 (E.D.N.Y. September 10, 2002) (probable cause to arrest even though defendant was not found to have drugs in his possession where officer observed a small object being exchanged for money, and drugs subsequently recovered from the alleged buyer). Once Ward was identified by the apprehension team and found to be in possession of crack cocaine, probable cause to arrest Defendant had been established. See Smith v. City of New York, No. 04 Civ. 3286 (TPG), 2010 WL 3397683, at *6 (S.D.N.Y. Aug. 27, 2010) (probable cause to arrest "when the officer believes, based on his or her own observation and experience, that an individual was engaged in a hand-to-hand drug sale"); United States v. Washington, No. 02 Cr. 1574 (LTS), 2003 WL 21250681, *3 (S.D.N.Y. May 29, 2003) (probable cause to arrest where officer observed

11

defendant engage in hand to hand transaction and drugs subsequently recovered from the alleged buyer).

C.  The Location of Defendant's Arrest

Defendant argues that the inconsistency between the arrest address listed in the arrest report and the address testified to by the officers' in the hearing irreparably undermines probable cause for arrest. (Def. Mem. at 6-8.) The Court does not find this argument persuasive. Officers Lawson, Salmeron and Roberts all indicated on the map that the arrest of Defendant took place on the north side of W. 114th Street, in the vicinity of the first four buildings west of Wadleigh High School. (Oct. Tr. at 13, 102, 117.) The three officers uniform memory with respect to the location of the arrest override the inconsistencies found in their activity book and arrest report. It is clear from Officer Salmeron's testimony that she relied on her activity book for the arrest location of 204 W. 114th Street which she entered into the arrest report. 204 W. 114th Street would be on the south side of the street just west of the corner of 7th Avenue. In fact, when asked on cross-examination whether 204 W. 114th Street was on the south side of the street, Officer Salmeron testified that "[Defendant] was on the north side, so it should be on the north side." (Oct. Tr. at 90.)

Defendant also points to the uniformity of the officers' state grand jury testimony with respect to the arrest location. While it is true that all three officers testified that the arrest took place at 204 W. 114th Street, the transcript does not indicate that a map was utilized to pinpoint the arrest location. The Court concludes that in the short state grand jury proceeding the officers were testifying based on their activity book or the arrest report and not based on the photograph of the location as they did at the suppression hearing.

12

D.  The Description and Arrest Location of Eric Ward

Defendant argues that Officer Lawson's description of Ward does not match up with the alleged buyer that the apprehension team arrested on 7th Avenue, and that Officer Lawson was describing a different individual. (Def. Mem. at 8-10.) Officer Lawson described Ward as a "tall, light-skinned, African-American male wearing a three-quarter length jacket and a black hat." (Oct. Tr. at 36.) In his hearing testimony, Officer Lawson described the jacket as light in color, but also very dirty. Officer Salmeron, however, described Ward as wearing a black sweater with a black jacket. Moreover, Defendant argues that both the video interview from the District Attorney's office as well as his mug shot, show that Ward cannot be described as a light-skinned African-American male. (Def. Mem. at 8.) Additionally, Ward was not wearing a black hat in his interview, nor does the arrest paperwork indicate that he was observed wearing one. (Id.)

The divergent descriptions of Ward provided by Officer Lawson and Officer Salmeron are offset by the consistent testimony regarding the more memorable fact, i.e., the wet condition of Ward upon arrest, and the fact that Ward was found with crack. Officer Lawson observed Ward walk directly through a fire hydrant sprinkler, a fact not known by Officer Roberts when he positively identified Ward and stated "this guy pissed himself." (Oct. Tr. at 13.) The fact that Officer Roberts commented on the wetness of Ward's clothes as he approached the apprehension team – prior to being informed that Ward walked through a fire hydrant sprinkler, establishes probable cause that Ward was the buyer that Officer Lawson described. Furthermore, Ward was observed tossing an object to the ground prior to his arrest, which was discovered to be tinfoil containing crack cocaine.

13

Defendant also argues that that the inconsistency in the testimony regarding the arrest location of Ward undermines the credibility of the officers even further. (Def. Mem. at 9.) Officer Lawson testified that he observed Ward turn north on 7th Avenue following his brief foray into the fire hydrant sprinkler. Officers Salmeron and Roberts, however, testified that Ward was arrested on the south corner of W. 114th Street and 7th Avenue. This inconsistency, while important, does not vitiate probable cause to arrest Defendant. Officers Salmeron and Roberts testimony regarding the arrest of Ward was generally consistent considering that the arrest took place more than a year before their testimony. The inconsistency also loses sight of Officer Lawson's undercover role. He alone witnessed the Defendant's three sales of crack and was responsible for identifying Defendant to the other officers who did not observe the sales. Accordingly, Officer Lawson had primary responsibility to keep the seller under observation and to identify him to those officers. Officer Lawson also was responsible for giving a description of the buyer to the officers responsible for making the arrest of the buyer. After receiving Officer Lawson's description, the arresting officers placed Ward under observation. Upon approaching Ward to make the arrest, Officer Salmeron observed him drop a piece of tinfoil which was discovered to contain crack cocaine.

Defendant further points to the fact that in his initial interview at the District Attorney's office, Ward denied any involvement in the purchase of crack cocaine from Defendant. This argument is belied by the fact that (1) Ward was found with crack cocaine upon his arrest and (2) Ward later plead guilty to Criminal Possession of a Controlled Substance. Defendant argues that Ward's post-arrest statements should be credited, despite the entrance of a guilty plea on the matter. (Def. Reply Mem. at 7.) The Court does not credit these post-arrest statements as they

are not unusual at that stage of a proceeding. The Court concludes that the Government has established that probable cause existed to place Defendant under arrest. While not addressed at the hearing, Defendant's motion also sought to suppress his post-arrest statement at the precinct to Officer Salmeron, (supra p. 8,) asking "what he was arrested for?" The testimony at the hearing shows that that this statement was volunteered by Defendant and not the result of a custodial interrogation. See Miranda v. Arizona, 384 U.S. 436 (1966). Defendant also sought to suppress a "show-up" identification procedure subsequent to his arrest. Defendant has proffered no evidence that such a procedure was utilized. Accordingly, Defendant's motion to suppress his post-arrest statement and identification procedure are denied.

### III. Conclusion

The Government has shown that police had probable cause to arrest the Defendant on June 1, 2010. Accordingly, Defendant's motion to suppress evidence seized as fruits of an unlawful arrest is denied.

IT IS SO ORDERED

Dated: New York, New York
January 10, 2012

Robert P. Patterson, Jr.
U.S.D.J.

Copies of this order were faxed to:

*Counsel for the Government:*

Jessica Rose Lonergan
U.S. Attorney's Office, SDNY
One St. Andrew's Plaza
New York, NY 10007
(212)-637-1038
Fax: (212)-637-2937


*Counsel for Defendant:*

Christopher Aaron Flood
Federal Defenders of New York Inc. (NYC)
52 Duane Street
10th Floor
New York, NY 10007
(212)-417-8734
Fax: (212)-571-0392